**KEYSTONE FLOOR PRODUCTS CO.**

v.

**The BEATTIE MANUFACTURING CO., et al.**

**Civ. A. No. 73–1016.**

United States District Court,
E. D. Pennsylvania.

June 15, 1973.

Lawrence Goldberg, Goldberg & Frankel, Michael Brodie, Pechner, Sacks, Dorfman, Rosen & Richardson, Philadelphia, Pa., for plaintiff.

Patrick T. Ryan, Ward T. Williams, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

In this diversity action, plaintiff, Keystone Floor Products Co. (Keystone) seeks injunctive relief and damages alleging that the defendants engaged in the following unlawful conduct: (1) breach of contract by defendant Beattie Manufacturing Co. (Beattie); (2) malicious interference with contract by defendant Beattie; (3) unfair competition by defendant Beattie; and (4) antitrust violations by both defendants. Presently before the Court is plaintiff's motion for a preliminary injunction based upon plaintiff's first three allegations.

On May 8, 1973, after notice to defendants, a temporary restraining order was issued prohibiting defendants from:

(1) Inducing or attempting to induce any of plaintiff's customers from purchasing carpet from any other, than plaintiff.

(2) Inducing and interfering in any manner whatsoever with plaintiff's present or prospective contractual relations with plaintiff's customers.

(3) Interfering in any manner whatsoever with plaintiff's employees present or past, specifically as to disclosure of plaintiff's confidential information and trade secrets.

(4) Using, disclosing or attempting to use or disclose for the benefit of themselves or any other person directly or indirectly any confidential information acquired by defendants Levenkron and Wittenberg while in plaintiff's employ. The temporary restraining order was modified during the course of the hearing on plaintiff's application for a preliminary injunction, and at the conclusion of the hearing it was extended, as modified, with Beattie's consent.

For the reasons set forth herein, the temporary restraining order will be dissolved and plaintiff's motion for a preliminary injunction will be denied.

### Breach of Contract

Defendant Beattie is engaged in the manufacture and nationwide distribution of carpeting. Beattie sells its brand-name products to approximately 20 to 25 carpet distributors throughout the country and, in some markets, sells its brand-name carpet directly to retail commercial outlets. In 1966 Beattie appointed Keystone as distributor of certain lines of Beattie brand-name carpets in the Philadelphia, Baltimore and Washington, D. C. areas. In 1971, Keystone was also appointed Beattie's distributor in northern New Jersey. Although there was no written agreement

between Beattie and Keystone, Beattie did publish a list of "General Terms and Policies for Distributors" in May 1970. Paragraph 15 of this writing provided as follows:

"The mill-distributor relationship may be discontinued without cause, provided 60 days notice is given by either party. This practice will be considered as common usage and both parties will be notified where the communication was made as was this by certified mail, return receipt requested."

The May 1970, statement of general terms and policies also included paragraphs relating to credit terms and claims handling. The Testimony of Richard A. Freed, President of Keystone, and John Beattie, President of Beattie, indicated that policies of credit and claims were subject to negotiation and change. Keystone was formally advised of its sole distribution rights in the area of its distributorship on January 17, 1972 by letter from John A. Beattie. In July 1972, plaintiff moved its place of business to obtain increased warehouse space. Beattie carpet comprised a substantial portion of Keystone's inventory in this new warehouse, although Keystone also distributed carpet manufactured by several other companies.

On April 25, 1973, Beattie notified Keystone that its distributorship would be discontinued,[1] but agreed to continue to supply Keystone for 60 days, or slightly longer if Keystone believed it necessary, on a C.O.D. basis only. Immediately after giving this notice Beattie commenced soliciting business in the Philadelphia and northern New Jersey areas.

Keystone concedes that Beattie could terminate its distributorship without cause, but contends that Beattie breach-ed a valid contract between the parties by the following acts and conduct:

(a) Defendant failed to give plaintiff 60 days' notice of the discontinuance of the mill-distributor relationship, as required by Paragraph 15 of the May 25, 1970 writing.

(b) Defendant's purported notice of discontinuance of the mill-distributor relationship was not made by "certified mail, return receipt requested" as required by Paragraph 15 of the writing of defendant dated May 25, 1970.

(c) By changing the terms of payment for defendant's products by plaintiff from "5% 30 days, net 31, or 4% 60 days, net 61," as set forth in Paragraph 5 of defendant's writing dated May 25, 1970, to "a C.O.D. basis only," defendant breached the terms of the agreement establishing the distributorship.

(d) Since approximately the middle of April 1973, through various of its agents and representatives, defendant has itself acted as a distributor of its carpet in the geographic area of plaintiff's distributorship and has thereby violated the contract or agreement establishing plaintiff as defendant's sole distributorship in that area.

Keystone contends that as a result of Beattie's alleged breaches of contract, it is suffering immediate and irreparable harm for which there is no adequate remedy at law. Accordingly, it seeks a preliminary injunction restraining defendant from continuing these alleged breaches.

■■■■ Assuming, arguendo, the existence of a valid contract, which could be enforced at law like any other, the Court cannot conclude that equitable relief in the nature of a preliminary injunction is also available to Keystone. Initially, Keystone has not made a suf-

1. John Beattie, president of the defendant corporation, testified that his decision to terminate the Keystone distributorship was based on several factors including a disproportionate number of claims submitted by Keystone for price adjustments and defective goods, information received by Beattie from Citizens and Southern, factors, on March 22, 1973, that they would not extend credit to the Keystone account, and a sharp reduction of Keystone sales in early 1973.

ficient showing that in the absence of an injunction it will suffer immediate and irreparable harm which could not be compensated by damages. There was evidence that Keystone had traditionally distributed carpets of several other manufacturers and that Keystone had sent an emissary to the South in February 1973, for the purpose of replacing existing lines of Beattie products with carpet lines of other manufacturers. While it is apparent that plaintiff has and will continue to suffer economic injury caused by Beattie's refusal to continue selling to Keystone other than on a C.O.D. basis and by Beattie's competition in certain areas of the market, the severity, in fact, of such injury has been left largely unproven. More important, however, in the circumstances of this case, is the rule that equitable relief should not be granted if it will involve repeated recourse to the court in order to do justice to both parties.[2] Keystone seeks to have Beattie enjoined from selling its carpet in competition with Keystone for the 60 day period allegedly required by a contract between the parties. Any such injunction would, of course, be conditioned upon Keystone continuing to devote its efforts to distribution of Beattie carpet in the area of its distributorship. Too much would depend on cooperation that could not be expected from the parties engaged in the present litigation. There was testimony that Keystone submitted fraudulent claims to Beattie, that it had passed off other carpeting as a Beattie product, and that in February 1973, it was seeking replacement lines for Beattie products. As Judge Learned Hand stated in Bethlehem Engineering Export Co. v. Christie, 105 F.2d 933 (2d Cir. 1939):

"It would indeed be easy to forbid the defendant to contract with anyone else, and that might force them to go on with the plaintiff's contract. But the continuance of such an injunction would depend upon the continuance of the defendant's obligation to the plaintiff; and the continuance of that obligation would in turn depend upon the plaintiff's continued performance of its duties under the contract. . . They involve, not only the faithful prosecution of the business in general (which of itself might involve constant scrutiny) but cooperation with the defendants . . . . Every reason which makes a specific performance of the defendants' obligation impracticable applies equally to an injunction conditional on the plaintiff's performance, since the two performances are so mutually interwoven." (p. 935)

*Malicious Interference With Contract*

Plaintiff alleges that Beattie hired Albert Levenkron and Arnold Wittenberg, former employees of Keystone, and also solicited Seymour Matuson and George Sherenian, present employees of Keystone, for the purpose of injuring plaintiff's business.

In Albee Homes, Inc. v. Caddie Homes, Inc., 417 Pa. 177, 207 A.2d 768, 771 (1965), the Supreme Court of Pennsylvania stated:

"[T]he offering of employment to a person under a contract, terminable at the will of either, with another is not actionable in and of itself . . . . . As stated in Morgan's Home Equipment Corp. v. Martucci, 390 Pa. [618] at 633–634, 136 A.2d [838] at 847; 'The systematic inducing of employes to leave their present employment and take work with another is unlawful when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employes. So also, when the inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his

---

2. *See,* Bach v. Friden Calculating Mach. Co., Inc., 155 F.2d 361 (6th Cir. 1946); Bethlehem Engineering Export Co. v. Christie, 105 F.2d 933 (2d Cir. 1939).

customers, the injured employer is entitled to protection.' "

It is conceded that the employment agreements between Keystone and its former and present employees involved in the circumstances of this action were terminable at will. The factual question presented, therefore, is whether the purpose of employment discussions between Beattie and Keystone employees was to obtain the services of skilled employees or to cripple and destroy plaintiff's business.

The testimony and employment backgrounds of all witnesses at the hearing clearly indicated that it is common for employees in this industry to switch employers quite frequently while remaining in the same geographical area and retaining a personal loyalty to the same customer contacts. Albert Levenkron, who has been employed by four different employers in the carpet industry in the past six years, commenced his employment with Keystone in July 1969, resigned his position as sales manager of Keystone on April 17, 1973, and was hired by Beattie on April 23, 1973. Mr. Levenkron had become dissatisfied with the turn of events occurring at Keystone in the six months prior to his termination of employment and decided to seek employment elsewhere. Arnold Wittenberg commenced employment as a carpet salesman for Keystone in March 1972, after terminating a similar position with Western Carpet Company. Mr. Wittenberg accepted a position with Beattie on April 25, 1973, after he became dissatisfied with his position and the opportunities for advancement at Keystone. He has covered the same sales territory with all three companies. Both Levenkron and Wittenberg commenced employment with Beattie at salaries lower than their salaries with Keystone, although Levenkron was promised a bonus which should

result in a slightly higher income. There was also testimony that John Reilly, a sales manager for Beattie who has been a carpet salesman for several different carpet companies in the Philadelphia and northern New Jersey areas for the past twenty-five years, had employment discussions with salesmen Seymour Matuson and George Sherenian of Keystone. There was some dispute as to whether these conversations were initiated by Reilly for employment purposes or for the purpose of evaluating the ability of Keystone and its sales personnel to effectively sell the Beattie line,[3] but it is a fact that Mr. Matuson and Mr. Sherenian are still Keystone employees.

In the Court's view, it cannot be inferred from the weight of credible testimony that Beattie has unlawfully induced any Keystone employees to terminate their employment with Keystone for the purpose of debilitating plaintiff's business organization or for the purpose of having them commit wrongs against Keystone.

### Unfair Competition

Several years prior to the institution of this action, Richard Freed designed a program which, when used in conjunction with a computer, produces a monthly print-out of various information pertaining to the business done by plaintiff with its various customers for varying time periods. More particularly, these monthly print-outs indicate, inter alia, the dollar amount of sales per month, per customer and per product line as between plaintiff and each of its customers. In addition, the print-out affords, on a cumulative basis, the volume of sales, again per customer and per product line, for the year in question and for the preceding year. Each month, each of plaintiff's salesmen is given that portion of the print-out per-

---

3. John Reilly testified that after he learned the business relationship between Stephen and Richard Freed, the principals of Keystone, was about to be dissolved, he became concerned about the effect of this dissolution on the ability of Keystone to sell the Beattie line, and that his primary purpose in talking with these Keystone Salesmen was to elicit their opinion on the effect such a dissolution would have on the Keystone sales force.

taining to customers in his sales territory for the preceding month. The salesmen are advised by plaintiff at the time of their hire that the information contained on the print-outs is highly confidential in nature and is to be disclosed to no one. Plaintiff contends that the information contained in these computer print-outs are "trade secrets" and that Beattie has unlawfully used this information to compete with Keystone.

■ While it is questionable whether the customer information contained in Keystone's computer print-outs amounts to "trade secrets" protected by law,[4] Keystone's allegation of unfair competition is clearly without merit because Beattie has never used any Keystone customer lists or other customer information to solicit business. The testimony indicates that while Albert Levenkron had access to Keystone customer information, this information was never removed by Mr. Levenkron from Keystone nor given to or utilized by Beattie. At the commencement of this lawsuit Arnold Wittenberg was still in possession of the monthly print-out he received from Keystone for the previous month, but the testimony indicates it remained in his files and no customers were solicited by Mr. Wittenberg, as an employee of Beattie, which resulted from the use of the Keystone computer print-outs. Keystone argued that it should be inferred that Beattie was using the Keystone computer print-outs to solicit customers because Beattie did not have prior business contacts in the retail market. The testimony of retailers presented to support this contention indicated, however, that the Beattie salesmen who visited these retailers had established business relationships with these accounts developed over the years as representatives of other carpet manufacturers and distributors.

Plaintiff also contends that the testimony of one retailer that one Beattie salesman misused a Keystone price list entitles Keystone to relief. This isolated instance of misconduct will not support the granting of a preliminary injunction.

---

4. *See*, Burroughs Corp. v. Cimakasky, 346 F.Supp. 1398 (E.D.Pa.1972) ; Van Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 213 A.2d 769 (1965) ; Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276, 203 A.2d 469 (1964) ; Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960) ; Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).